## COLLEGIATE WORLD PUB. CO. v. DU PONT PUB. CO. et al.

(District Court, N. D. Illinois, E. D.   July 22, 1926.)

### No. 4467.

**1. Trade-marks and trade-names and unfair competition ☞3(4, 5).**

Name merely descriptive of qualities or composition cannot be monopolized as trademark.

**2. Trade-marks and trade-names and unfair competition ☞3(2).**

Name "College Humor," applied to magazine publishing extracts and illustrations from college humorous publications, being merely descriptive, *held* invalid as a trade-mark.

**3. Trade-marks and trade-names and unfair competition ☞99.**

Whether unfair competition exists is mixed question of law and fact.

**4. Trade-marks and trade-names and unfair competition ☞70(1)—Defendant's use of name "College Comics," applied to a magazine, and size, color, etc., held not unfair competition with plaintiff's similar publication, "College Humor."**

Defendant's use of name "College Comics," applied to magazine publishing extracts and illustrations from college humorous publications, and size, color, etc., *held* not unfair competition with plaintiff's similar publication "College Humor," having similar size and dress-up.

In Equity. Suit by the Collegiate World Publishing Company against the Du Pont Publishing Company and others. Decree for defendants.

C. B. Morrison, as master in chancery, filed the following report:

"The undersigned, C. B. Morrison, master in chancery of this court, respectfully represents unto your honors that the above-entitled cause was heretofore referred to him to take and report the evidence together with his conclusions of fact and law thereon.

"Pursuant to the reference, ·the parties appeared before the undersigned on divers days, and thereupon certain oral testimony and documentary exhibits were offered and introduced in evidence, and other proceedings had and taken as will more fully appear from the transcript of such testimony and proceedings herewith returned into court. After the testimony was completed, written briefs were submitted, oral arguments were made on October 9 and 10, 1925, and the case was taken under advisement by the master.

### "Findings of Fact.

"The plaintiff, the Collegiate World Publishing Company, is a corporation organized December 1, 1920, under the laws of Indiana, with its principal place of business in Chicago, Ill., and is engaged in the publishing business.

"The defendant Du Pont Publishing Company is a corporation organized August 6, 1924, under the laws of Delaware, with its principal place of business in Chicago, Ill., and is engaged in the publishing business.

"Defendant J. Vincent Spadea was the originator of defendant's magazine, and was instrumental in the organization of the Du Pont Publishing Company, becoming its president and a director thereof.

"Defendant Harry L. Silverman is the manager of the company that distributes defendant's magazine. He is also vice president and a director of the corporation defendant.

"Defendant Eugene Du Pont was originally employed to do the editorial work on defendant's magazine. The evidence does not show how long he remained in this employment.

"In February, 1920, the plaintiff began to publish a magazine called the 'Collegiate World' and continued its publication until April, 1922, when it was discontinued, having proved a financial failure. It was a national magazine, covering the collegiate field with athletic and fraternity news, and was a fiction as distinguished from a humorous magazine. In the second issue, published in March, 1920, there were two pages headed 'College Humor,' containing extracts and illustrations from various college humorous publications. In August, 1920, plaintiff published a book called 'Best College Humor,' selling for $2 a copy, containing material similar to the two-page spread in the Collegiate World, and in the winter of 1920–21 put out a 50-cent edition or magazine called 'College Humor.' In the spring of 1922 plaintiff published the second number of the magazine College Humor, and continued to publish it thereafter at intervals until it was issued quarterly, eleven numbers in all having been issued at the time defendant's magazine came out. Beginning with the March, 1925, number, the magazine has been issued monthly.

"On June 9, 1923, the plaintiff filed its application in the Patent Office for the registration of the trade-mark 'College Humor' for use on a magazine, on November 27, 1923, the trade-mark was duly registered, and plaintiff has continued the use of this name on its magazine to the present time.

"About May 1, 1924, J. Vincent Spadea, one of the defendants, who had for some time been considering the publication of a

magazine in the nature of a digest of specialist magazines to be sold to country newspapers, but had not been successful in obtaining the necessary financial assistance, decided to publish a magazine to be made up from excerpts and illustrations from the various college humorous publications. In pursuance of this plan, he employed defendant Eugene Du Pont to assist him, particularly to handle the editorial work, and under the name 'Du Pont Publishing Company' wrote various college publications, asking for the privilege of reprinting. After some consideration by Spadea and Du Pont, the name 'The Co-Ed' was decided upon, and by June 1st a complete dummy containing the material printed in the first number of the magazine when published had been prepared together with a cover design bearing the name 'The Co-Ed.' Defendants' Exhibit J1. Spadea submitted this dummy and cover to different people during June, and made no secret of the fact that he was about to publish the magazine. The work continued, and on August 1, 1924, Spadea, with the assistance of others, under the name Du Pont Publishing Company, published the first issue of the magazine The Co-Ed, known as the October number. The magazine was a digest of humor and illustrations taken from various college magazines.

"Following this issue, the plaintiff filed a bill to enjoin its continued publication. The Du Pont Publishing Company, incorporated on August 6, 1924, took over the business begun by Spadea, and on September 28, 1924, after the filing of the above bill, got out the second number of The Co-Ed, known as the November number. This was the last issue under that name. The name was changed to College Comics, and the December number of the magazine, being the first under that name, was published October 28, 1924, and the magazine has ever since continued to be published as College Comics.

"On November 10, 1924, shortly after the first issue of College Comics, plaintiff filed the bill of complaint in this cause, alleging that defendants' magazine College Comics, by the use of the name College Comics and the slogan 'College Wit—the World's Best Humor,' and defendants' magazine the Co-Ed, by the use of the slogan, 'College Wit —the World's Best Humor,' infringed plaintiff's registered trade-mark College Humor, and also alleging that defendants had been guilty of unfair competition by the same means, the dress-up of the magazines, and otherwise.

The words composing the name College Humor are common words, and as used by plaintiff are descriptive of its magazine, the word 'humor' describing the character of the contents and the word 'college' the source from which the material is obtained or the activities to which it relates. In the beginning, the magazine consisted entirely of extracts and illustrations taken from college humorous publications, and the back cover of the first six numbers bore the illustration of a college yell leader with the names of many college publications scattered over it. Beginning with the autumn, 1923, number, plaintiff began to insert more original matter until, at the time of the hearing before the master, the magazine would be described as a combination of humor and fiction—the jokes coming from college publications, and the stories being of a humorous character and bearing on college life.

"The word 'college' had been used as a part of the title of various college papers or magazines before plaintiff used it in the name of its magazine, such as College Life, published since 1888 by the College of Emporia, The College Coyote, published since 1913 by the College of Idaho, etc. These publications were distributed and sold, not only to the students of the respective colleges, but also to their alumni in various states. Defendants' Exhibits HH1 to HH5.

"Plaintiff was not the pioneer in reprinting excerpts and illustrations from college humor publications. The magazine Judge, beginning in 1912, contained a column headed 'With the College Wits' consisting of such material, this column being enlarged to a page in 1917. Judge used a design at the top of its 'With the College Wits' page composed of the names of college magazines, similar to the design used later by plaintiff for the back cover of the first six numbers of College Humor. Beginning with March 13, 1920, an annual number of Judge was gotten out, known as the College Wits Contest Number, composed almost entirely of original material produced by college students.

"As heretofore indicated, humorous magazines have been published for many years by college students of almost all the principal colleges in the country. They are described and referred to collectively as college comics, as distinguished from literary and other college publications. College Comics is the name chosen by the Du Pont Publishing Company as the name of its magazine. That name too is descriptive, as the defendants' magazine is devoted to the college field, and the sources from which the material comes

are the various college humorous publications.

"The word 'college' has not acquired a secondary meaning, referring to plaintiff's magazine alone. Plaintiff's magazine is known and called for by its full name College Humor, and 'college'—the word common to the names of both plaintiff's and defendants' magazine—is not the distinguishing word of plaintiff's title. The words 'humor' and 'comics' are not similar in appearance and sound, and the names College Humor and College Comics differ accordingly. While the names convey much the same meaning, this is necessarily so because both are descriptive of the articles to which they are applied. Defendants' name College Comics has always been displayed in a distinctive manner on the magazine, being printed in letters of peculiar type on a flying white banner.

"The phrase, 'College Wit—the World's Best Humor,' was printed across the top of the front cover and above the name The Co-Ed on the two numbers of the magazine put out by the defendants under that name and in the same position on the first number of defendants' magazine College Comics, and thereafter the use of those words was discontinued, and instead defendants used the catch phrase 'America's Humorous Monthly.' This last phrase was adopted after this suit was begun.

"The words in the slogan, 'College Wit—the World's Best Humor,' were printed in much smaller type than the title of the magazine, and are of uniform size, without emphasis on any one word. The slogan is but an expression of opinion as to the merits of the magazine on which it is printed. The words are descriptive words in common use.

"Plaintiff claims that defendants' use on its magazine of a cover having a red background and bearing the picture of a girl in the central part thereof is unfair, as is also the similarity in the size of defendants' magazine to plaintiff's.

"It is common practice to use the picture of a girl on covers of magazines, and a comparison of the magazines of plaintiff and defendants shows there is no similarity in the illustrations of the girls appearing thereon.

"It cannot be said that, when defendants' first Co-Ed was put out, plaintiff had identified red as the predominant color of the covers of its magazine. Up to that time plaintiff had only published eleven numbers of College Humor. Of the covers on the first six numbers, only one had red appearing on it, and the ruling color of that is blue. The next four numbers had covers with red backgrounds, and the eleventh, which was the one on the market at the time defendants' first magazine appeared, had black as the predominating color of the background. The color on defendants' first Co-Ed was red, and that color has been used by defendants ever since, and defendants' covers can more truly be said to have a background of red than plaintiff's subsequent numbers, for in giving a comparative description of the two it would have to be said that defendants' magazine has a red background while plaintiff's at most has a red border. Red is a popular color for the covers of magazines generally, because it is bright and attracts the attention of the purchaser.

"Defendants' and plaintiff's magazines are about the same size, plaintiff's being a fraction of an inch longer. There are many magazines on the market approximately this size, and there is nothing unusual in the fact that defendants' magazine is about the same size as plaintiff's.

"The plaintiff claims that the similarity of defendants' name 'College Comics' and the slogan 'College Wit—The World's Best Humor' to plaintiff's name, and the resemblance in the dress-up of the two magazines, have caused confusion among purchasers, and that plaintiff has been injured thereby.

"There was some confusion, but it was due to the carelessness or inattention of dealers and purchasers who did not know a new magazine had come out. Such confusion is to be expected at first, where a new magazine enters the field dealing with the same general subject-matter as a magazine already on the market. This confusion was negligible, and would soon disappear as the reading public came to know there were two magazines dealing with the humorous side of college life. The confusion that existed was due to the fact that plaintiff selected descriptive words for its name.

"Similarity in names of magazines dealing with the same subject is not unusual, but on the contrary is quite common, such as Popular Science, Popular Mechanics; Outdoor Life, Outdoor Recreation; Field and Stream, Forest and Stream; Boy's Life, Boy's Magazine; Ladies Home Journal, People's Home Journal; Radio Doings, Radio Digest, Radio World, Radio Age, Radio Progress, Radio News, Radio Broadcast; Motor, The Motor, Motor Transport, Motor Record, Motor World, Motor Age, Motor Life; etc.

"Plaintiff contends that it was unfair for defendants to obtain reprint privileges from college humorous magazines from which

plaintiff had theretofore by permission been using excerpts and in a few instances had exclusive contracts. While the Du Pont Publishing Company endeavored to and obtained reprint privileges from many of the college publications, plaintiff did not have the right to a monopoly on that source of supply, and there is no evidence of any unfair or wrongful conduct on the part of any of the defendants in this connection. The evidence indicates that plaintiff's efforts to obtain exclusive reprint privileges began after it learned defendants' magazine was coming out or at least became more active. The rivalry between the two sides in reference to obtaining rights in this source was keen, and both were alert to the importance of the situation.

"On July 30, 1924, one day before defendants published their Co-Ed, plaintiff published a magazine also bearing that name, and shortly thereafter began the suit heretofore mentioned to enjoin defendant's Co-Ed. Plaintiff's magazine was not similar to defendants', but was composed of stories supposed to bear on college life. Each side charges unfairness on behalf of the other in the use of the name 'Co-Ed.' The suit on that question is still pending, and the master does not deem the evidence before him sufficient to make findings on the subject other than that defendants did not know until July 30, 1924, that plaintiff was coming out with a magazine under the name 'Co-Ed,' and that plaintiff knew at least as early as July 1st that defendants were intending to use that name.

"The Du Pont Publishing Company published only two numbers of its magazine under the name 'Co-Ed,' and then changed the name to "College Comics,' because, as defendants claim, there would be confusion from two magazines on the market with the same name, and the contents of plaintiff's Co-Ed were of such questionable character as to render the name valueless; defendants also contending that plaintiff's Co-Ed was brought out with the intent of besmirching that name. Five numbers of plaintiff's Co-Ed were published, the last being the January, 1925, number, issued about January 5th. It was then abandoned as a financial failure and not thereafter published.

"Findings of Law.

"It is found as a conclusion of law that the bill of complaint should be dismissed for want of equity.

[1, 2] "The plaintiff's trade-mark is invalid. A name that is merely descriptive of the qualities or composition of an article, and

14 F.(2d)—11

the primary meaning of which others may employ with equal truth, for the same purpose, cannot be monopolized as a trademark. Beckwith v. Commissioner of Patents, 252 U. S. 538, 40 S. Ct. 414, 64 L. Ed. 705; Warner v. Lilly, 265 U. S. 526, 44 S. Ct. 615, 68 L. Ed. 1161; Standard Paint v. Trinidad, 220 U. S. 446, 31 S. Ct. 456, 55 L. Ed. 536; Elgin v. Illinois, 179 U. S. 665, 21 S. Ct. 270, 45 L. Ed. 365; Brown v. Meyer, 139 U. S. 540, 11 S. Ct. 625, 35 L. Ed. 247; Photoplay v. La Verne (C. C. A.) 269 F. 730.

[3, 4] "The facts in this case already stated do not bring it within the law condemning unfair competition. Whether such competition exists or not is a mixed question of law and fact. There is some conflict on this subject in the decisions, most of which disappears when the facts of the particular case are considered. In the Seventh circuit the view taken by the Court of Appeals is clearly indicated in Feil v. Robbins, 220 F. 650, 136 C. C. A. 258, and Sears, Roebuck & Co. v. Elliott, 232 F. 588, 146 C. C. A. 546.

"The attorneys on both sides filed elaborate briefs with the master and quoted extensively from the cases relied on. The authorities presented have been considered, and in the master's opinion, support the conclusions of law stated above. To analyze the cases cited would unduly extend this report and would be of little, if any, help to the court in arriving at its conclusions, as the attorneys will, of course, present the authorities to the court.

"Objections.

"The undersigned further reports that on the 25th day of November, 1925, he mailed to counsel for the respective parties a copy of his draft report, together with a notice in writing to the effect that objections to the report might be filed on or before the 5th day of December, 1925. Thereafter, at the request of counsel for plaintiff, the time was extended, and on December 19, 1925, plaintiff filed objections numbered 1 to 12, inclusive. No objections were filed by defendants.

"The passing upon objections was delayed at the request of counsel for plaintiff, and, with the acquiescence of counsel for defendants, until the present time. The master has considered the objections filed, and overrules each and every one, and stands by his report.         C. B. Morrison.
"Master in Chancery."

David B. Gann, Frederick Secord, J. Walter Stead, Loy N. McIntosh, and Junius C. Scofield, all of Chicago, Ill., for complainant.

Arthur E. Wallace, of Chicago, Ill., for Collegiate World Pub. Co.

Herman Waldman, of Chicago, Ill., for Eugene Du Pont.

Charles W. Hills, Charles W. Hills, Jr., and Russell P. Fischer, all of Chicago, Ill., for Du Pont Pub. Co. et al.

LINDLEY, District Judge. The report of the master is approved and adopted by the court as its opinion.

---

### LONABAUGH v. MOUNTAIN STATES LIFE INS. CO.

(District Court, D. Wyoming. July 24, 1926.)

#### No. 1540.

Insurance ⬤➙367(1)—Provision that defaulted premium should be charged against a life policy as loans held not to apply until the policy by its terms had a "loan value."

An "automatic provision" of a life policy, that, if any premium was not paid within the period of grace allowed, it should be charged against the policy as a loan, provided the "loan value" was sufficient, and, if not, such value should be applied to keep the policy in force for so long as it would pay, *held* not to apply until the policy had been in force for such length of time as by its terms to have a guaranteed or loan value.

At Law. Action by Catherine Lonabaugh against the Mountain States Life Insurance Company. On demurrer to petition. Demurrer sustained.

Roy Bedford, of Sheridan, Wyo., and Albert D. Walton, of Cheyenne, Wyo., for plaintiff.

John Dillon, of Cheyenne, Wyo., Leslie E. Hubbard, of Denver, Colo., R. E. McNally, of Sheridan, Wyo., and Clarence M. Hawkins, of Denver, Colo., for defendant.

KENNEDY, District Judge. This is an action to recover upon a life insurance policy issued by the defendant upon the life of one Harvey Ellsworth Lonabaugh, in which the plaintiff, now his widow, is named as beneficiary. The petition is challenged by a general demurrer.

The pertinent facts disclosed by the petition, and the policy upon which the suit is based, are as follows: On March 27, 1921, the policy was issued, carrying an annual premium of $170.65, which insured the life of Lonabaugh for the sum of $5,000. The premium for the first year, beginning on March 27, 1921, was paid, as was that for the year beginning March 27, 1922, but the third premium, falling due March 27, 1923, was not paid at the time it became due or within the thirty day's grace therefor provided by the policy, nor before the death of Lonabaugh, which occurred on the 13th of January, 1924.

Some of the provisions of the policy which are pertinent to the points involved, are as follows:

"Nonforfeiture Provisions.

"Cash value—After three full years' premiums have been paid and this policy is in full force, free from indebtedness and unassigned, the insured may, if elected prior to the expiration of any grace period and upon proper surrender of this policy, receive the then cash value, or apply the said cash value to purchase.

"Paid-up insurance, nonparticipating, for a reduced amount payable at the same time and in the same manner and condition as this policy; or apply the said cash value to purchase.

"Extended insurance, for the face amount of this policy for a limited term of years.

"The cash, paid-up, and extended values referred to above shall be such as are shown opposite the age of the insured (as stated in this policy), in the table of guaranteed values on page three (3) hereof. The amounts so payable may be increased by any dividend additions or decreased by any loans or other indebtedness."

"Automatic Provision.

"If any premium herein is not paid before the expiration of the grace period, the same plus interest shall be charged against the policy as a loan, providing the loan value is sufficient for such advance after deducting any existing loans and accrued interest; provided, however, that, if not sufficient to cover the entire premiums then due, a premium for such period shall be charged, as the available values are sufficient to cover. Notice of such advance shall be mailed to the insured, and at any time while this policy is thus sustained in force the payment of premiums may be resumed."

"Privileges.

"Thirty days' grace will be allowed for the payment of every premium after the first, during which time this insurance shall be continued in force. If the proceeds of this policy should become due by death of the insured during said grace, the entire premium for the then current policy year will be deducted from the amount payable."